# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs June 24, 2009

## STATE OF TENNESSEE v. MICHAEL JAMES BELL

**Direct Appeal from the Criminal Court for Anderson County**
**No. A4CR0490     Donald R. Elledge, Judge**

_____

**No. E2008-01499-CCA-R3-CD - Filed September 17, 2010**

_____

An Anderson County jury found Appellant Michael J. Bell guilty of first degree premeditated murder and was sentenced to life in prison. On appeal, Appellant claims that: (1) the trial court improperly admitted an inculpatory statement he made to police; (2) there was insufficient evidence for a finding of premeditation; (3) the trial court improperly admitted an autopsy report; (4) the trial court erred in giving the jury a "sequential" determination jury instruction; (5) the trial court improperly reiterated the sequential determination jury instruction in its verdict forms; and (6) the trial court improperly characterized Appellant's statement to the police as a "confession" in its instructions to the jury. Finding no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JOSEPH M. TIPTON, P.J., concurring in results only.

J. Thomas Marshall, Clinton, Tennessee, for the appellant, Michael James Bell.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; David S. Clark, District Attorney General; and Sandra N. C. Donaghy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

This case concerns a volatile love triangle, the meltdown of a nearly life-long friendship, and ultimately the death of one of the friends at the hands of the other. There is no dispute that Appellant shot and killed the victim, John Keith Russell; Appellant told the police he did. Rather, the dispute is about whether the jury should have seen that statement as well as other evidence that was introduced, how the jury was instructed to evaluate the evidence, and whether the evidence was sufficient to demonstrate premeditation.

Appellant and the victim had been close friends since the seventh grade. They worked together and at times lived together. Appellant was even godfather to the victim's son, whom he named after Appellant.

In the 1990s, Appellant had a long relationship with Lisa Cooper. The two lived together for several years. Around the end of 2001, Ms. Cooper and the victim began to see each other, unbeknownst to Appellant. Eventually, the victim told Appellant about the relationship, Ms. Cooper and Appellant broke up, and she moved in with the victim. In 2002, Appellant confronted the victim about the relationship with Ms. Cooper and their friendship generally. A fight ensued, and Appellant was badly beaten.

Hoping to get away from the entire situation, Appellant moved to Florida. He returned to East Tennessee after only a few months. Appellant started working with the victim again and occasionally slept at his house.

The relationship between Ms. Cooper and the victim began to deteriorate, and Ms. Cooper moved out in August 2004. At the same time, she came to Appellant—often through a mutual friend—with her complaints about the victim. Eventually, the two began to rekindle their relationship. Appellant helped her buy a car, and Appellant talked about the two moving in together. All along, however, Ms. Cooper continued to see the victim.

Things came to a head in November 2004. After a conversation in which Appellant professed his love, but Ms. Cooper told him the feeling was not mutual, the relationship between Appellant and Ms. Cooper appeared to be over. On the night of November 21, Appellant started calling Ms. Cooper's house, trying to locate her. He eventually found her car at the victim's house at 2:00 a.m. on November 22. Using a knife, he slashed the driver's side tires of both Ms. Cooper's car and the victim's truck, which was parked in the driveway directly in front of Ms. Cooper's car. Appellant returned home and went to sleep.

The victim and Ms. Cooper discovered the vandalism later that morning and had no doubt as to the culprit. The victim called police to report the incident, and Ms. Cooper called her daughter to get a ride. The victim also called Appellant and, according to Appellant,

launched into an angry, vulgar tirade. Appellant tried to call him back but could not get through.

Appellant then drove a friend's truck to the victim's house, taking a .22 caliber pistol with him. The victim was working on the tires when Appellant arrived. According to Appellant, the victim saw Appellant; got up; started toward him holding a lug wrench; and, with an angry look in his eyes, started talking about how he stole Ms. Cooper from Appellant. Appellant grabbed his gun and shot the victim seven times, including twice in the head. He left the scene, disposed of the gun, and returned home.

The victim's body was discovered draped over a jack he was using to work on the tires some forty-four feet from the street. A lug wrench was on the ground near him, covered by a jacket. There was no blood at the scene anywhere other than in the vicinity of the jack.

The police quickly turned their attention to Appellant. They contacted him through a friend, and Appellant agreed to meet with an investigator on the afternoon of November 22. He was taken to the detectives' office, where his clothes were exchanged for a jail uniform. He signed a Miranda rights waiver and gave a statement denying any involvement in the victim's death. He was released but met with investigators a few days later. Appellant was released after that meeting as well. However, at his request, a polygraph examination was scheduled for December 1. Appellant missed that appointment but rescheduled it for the next day. He went to the appointment, was re-advised of his Miranda rights and again signed a waiver, took the examination, and gave a statement admitting that he killed the victim.

Appellant was indicted on a charge of first degree premeditated murder. He moved to suppress the inculpatory statement he made after the polygraph examination, arguing that it was taken in violation of his constitutional rights to counsel. Appellant asserts he repeatedly requested counsel, but the police ignored his requests and interrogated him without counsel. The trial court held two hearings on this issue: one regarding Appellant's initial motion to suppress and another on a later motion to reopen. The trial court denied both motions and ruled that the statement was admissible. Appellant was tried by a jury, which convicted him of first degree premeditated murder, and he was sentenced to life in prison. He now appeals.

## A. Suppression Of Appellant's Inculpatory Statement

Anderson County Sheriff's Detective Bill Breeding was the first witness to testify at the motion to suppress hearing. Detective Breeding testified that he had spent more than thirty years in law enforcement, including more than fifteen years in Anderson County.

Detective Breeding first contacted Appellant on November 22, the day the victim was killed. Appellant met with him at the detective's office. Appellant was not under arrest at the time but was read his Miranda rights.[1] Appellant stayed for about two hours and was cooperative. Detective Breeding testified that during their discussion, Appellant requested a polygraph examination. Detective Breeding made an appointment for the test, which was to take place on December 1 in Knoxville. Appellant did not show up for the appointment. When Detective Breeding contacted Appellant to inquire why he had not come, Appellant told him that he had transportation problems. They reset the polygraph for the next day, December 2, at Detective Breeding's office. During that conversation, Appellant suggested Detective Breeding arrest him so that Appellant could get an attorney, which he could not otherwise afford. Detective Breeding reminded Appellant that Appellant had requested the polygraph, and Appellant assured Detective Breeding that he would take the test.

Appellant arrived for the polygraph on his own at about 1:00 p.m. on December 2. Detective Breeding introduced Appellant to Tennessee Bureau of Investigation (TBI) Special Agent Dennis Slagle, who conducted the polygraph. Agent Slagle read Appellant his Miranda rights, and Appellant signed a document waiving those rights. He also signed a polygraph consent form.

Detective Breeding left the room during the examination. An hour or two later, Detective Breeding returned and was informed that Appellant had admitted to Agent Slagle that he killed the victim. After Detective Breeding entered the room, Appellant gave a statement implicating himself in the victim's death. Appellant described the events, and Agent Slagle interrupted with questions. Detective Breeding was primarily just a witness. Appellant's statement was reduced to writing, and he signed two copies of the statement at around 6:00 p.m. Appellant's December 2 statement is as follows:

> This is the statement of Michael James Bell as given to Sgt. Bill Breeding, Anderson Co. Sheriff's Department and S.A. David G. Slagle, TBI, on 12/02/2004 at the Anderson Co. CID office, Clinton, TN.
>
> My name is Michael James Bell, my date of birth is 9/16/58 and my address is 612 Fowler St. Clinton, TN. I have been advised of my Miranda rights, understand those rights and voluntarily provide the following information:
>
> I have know[n] [the victim] since 7th grade. We used to work together and used to [be] friends. I didn't like his ways sometimes and we had problems

---

[1] Although Detective Breeding did not testify about it at this hearing, Appellant signed a Miranda rights waiver at the start of the November 22 meeting.

-4-

over him stealing things from work and over both of us dating Lisa Cooper. I have know[n] Lisa Cooper about nine or ten years. We have dated off and on for the past 9 or so years. I was aware that she was also dating [the victim] from time-to-time. About three years ago, Lisa and I broke up because I got tired of hearing her and then about nine months later, I got drunk and got in a fist-fight with [the victim]. This happened at his house. He won the fight and it was over with. I left and went to Florida. I came back in two or three months. In the past three years I haven't had any real contact with [the victim] other than just seeing him around town.

I knew that Lisa was still seeing [the victim], even though she said she was not. I got fed-up with the whole situation and during the early morning hours (maybe 0300) of November 22, 2004, I drove Bill Foster's truck (80s brown, Chevrolet 4X4) over to [the victim's] house in Claxton. I was keeping an eye on Bill's place while he was in Alaska and he had given me permission to drive his truck. I knew where [the victim] lived because he grew up there. I had been drinking some beer but wasn't drunk. I had taken a couple of Valiums. I drove up in the street in front of his house with the driver's door facing toward the house. I got out and poked the driver's side tires of his Chevy pick-up truck and Lisa's Chevy Camaro that was parked there. I figured I was being aggravated by them and so I'd aggravate them back. No one was with me at the time. I went home and went to bed. It was between 0200 and 0300. I used a little hunting knife I had.

I got up later that morning around 0700, drank a cup of coffee and then went outside to smoke. I ran out of cigarettes, so I drove down to the Git-N-Go store and got a cup of coffee and a pack of cigarettes. I was still driving Bill's Chevy pick-up. I was alone. I went back to the house. I was going to take Bill's truck back because I had to go to Knoxville and was going to use my mother's car. My mother is Argie Bell. I live with her now. After I returned, I got a call on my Crickett [sic] cell phone (865-237-5113) from [the victim] (I recognized his voice even though he had caller ID block on). He started cussing in a loud tone and said he was going to cut my balls off. I tried to say something but he kept yelling, saying something else I can't remember. I hung-up on him and then tried to return the call about 5 to 10 minutes later using the received call feature. I rung a number but it wasn't his (I guess because he had block on). I tried it once. At about the same time as I was trying to return [the victim's] call, my mother left in her car to go to swimming lessons at the Civic Center (around 0845). I was at the house alone and was waiting for her to return (normally around 1000-1015) to get the car and go to

Knoxville. I knew I had to take Bill's truck back and as I thought about what had been going on for the last eight or nine years with Lisa and the last three years with [the victim], I decided to drive over to [the victim's]. I got in my green Ford Ranger and got out a .22 revolver, nine shot I think, out from behind my seat. It is blue in color with a long barrel (at least 8 inches). I got this gun a couple of months ago. I assumed it was stolen because I got it from Rodney Cooper in exchange for a ride. I called Pat McGhee on my cell phone. I told her what [the victim] had said to me. She had just gotten up and so the conversation was short. I got in Bill's truck and drove to the Git-N-Go on Seivers Blvd. close to my house to get some gas. I got $10.00 worth. I drove over to [the victim's] house. I don't recall exactly but it was around 0915 when I got there. I was alone. I drove up and stopped with the driver's side facing the house. I saw [the victim] up by his truck. I think he was jacking it up or taking the tire loose. He turned and saw me. He started coming at me. He had the lug wrench in his hand when he first turned but then it hit the ground. I don't know if it hit the ground after I fired the first shot or not. I had the gun laying on the seat when I drove up. As he was coming toward me, he said, "I told a bunch of lies and stole your pussy." That is when I shot him. I was half-way out of the truck. I fired through the open window of the truck door. I am right handed. I fired three times or more, I think. I never counted the spent rounds. I don't know where I shot [the victim] but I know he went down. After the first shot, he turned sideways and then I fired the other shots. I got back in the truck and left. No one was around that I saw. The look on his face and the words he said about stealing pussy made me do it. I knew he was talking about Lisa.

I went down under the Clinch River green bridge and tossed the gun in the water. I didn't get rid of anything else at the time. I took Bill's truck back to his house. I talked to Pat McGhee again (I don't know if she called me or I called her) and she told me Lisa was taking a warrant and order of protection out on me. She said I was supposed to have been with Rick Taylor in his Pathfinder when the tires were cut. I don't recall telling her anything about [the victim]. Rick Taylor wasn't with me. After Mom got home (around 1015) I got her car and drove by Pat's to talk to her. I didn't tell her I had shot [the victim]. I wanted to know what she said about Rick being with me. I knew it wasn't true when Lisa said Rick was with me when the tires were cut. Her son came in about the time I left. I went by Randy Harber's house because I thought Rick would be there. I wanted to tell him that we had been accused of cutting tires. Rick was there and I talked to him and told him about Lisa accusing us of cutting tires. I didn't tell him I shot [the victim] and I didn't tell

him that I had cut the tires. I left to go to work but Officer Ridenour had called Bill and then Bill called me and said they wanted to talk to me. He said something had happened at [the victim's] and they wanted to talk to me and Rick. I told him to give Officer Ridenour my phone number. I turned around. He called me and I told him I was near Hensley's IGA in Norris. I stopped and waited in the parking lot of the IGA.

I think the next day, I threw a box of .22 bullets in the garbage at my house in the garbage can. They were the same kind of bullets that I used to shoot [the victim]. I had gotten the bullets at Wal-Mart right after I got the gun.

I hadn't told anyone I shot [the victim]. I lied to police when they first asked because I was in a state of shock or denial and scared. I'm telling the truth now. I shot [the victim]. I was by myself. No one asked me to do it. I didn't have any plan to kill him before he called me that morning. Part of the problem was that we were friends at one time and a friend shouldn't do a friend that way (taking his girlfriend). When we had the fight several years ago he kicked me in the head when I was down and poke[d] me in the eye.

I am sorry this happened. I really don't know how to explain how I feel about this. I've never done anything like this before.

I have read, or have had read to me, this statement which begins on Page 1 and ends on Page 3. I fully understand the contents of the entire statement made by me. The statement is true. I have initialed all corrections and have initialed or signed the bottom of each page containing the statement. I have made this statement freely without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful incentives. At the time of the making of this statement, I am not under the influence of alcohol, drugs, or any other type of intoxicant which would render me incapable of understanding the statement made by me.

Detective Breeding testified that Appellant never complained about anything while giving the statement. He was never threatened, and he was not arrested until after he made his statement. In fact, Detective Breeding specifically told Appellant that he was not under arrest when he arrived for the polygraph. No promises were made to Appellant to induce the statement. Moreover, during the December 2 meeting, Appellant never asked for an attorney, attempted to delay making a statement, or tried to leave.

Agent Slagle typed the December 2 statement, and Appellant reviewed it. Appellant signed the statement and initialed each page.

Agent Slagle said that he had worked in the TBI's Johnson City office since 1987. He was a licensed polygraph examiner at the time he met with Appellant in 2004.

Agent Slagle testified that he became involved in the case when the Anderson County Sheriff's Department requested his assistance in conducting a polygraph on Appellant. He met with Appellant at the detectives' offices on December 2, 2004. After he was introduced to Appellant, Agent Slagle read Appellant his Miranda rights. Agent Slagle asked Appellant if he understood his rights, and Appellant responded that he did and that he was willing to continue. Appellant signed a Miranda waiver and a polygraph consent form. Appellant was cooperative during the pre-test procedures. Although Appellant stopped the exam for about fifteen minutes to have a cigarette, he never indicated that he wanted to end the exam, that he was tired or needed a break, or that he wanted an attorney. Furthermore, Agent Slagle testified that he did not promise Appellant any benefits for his cooperation, nor did he make any threats against Appellant if he chose not to cooperate.

The test ended around 2:50 p.m., and Agent Slagle took approximately twenty minutes to score it. He and Appellant then talked for a couple of hours about questions that arose during the exam. They took another break around 4:30 p.m. and finished around 5:45 p.m.

Agent Slagle typed Appellant's statement. He printed it twice, however, because his first print-out was on low-quality paper. Appellant was given a chance to review and change or correct his statement, and he signed and initialed both copies.

Detective Breeding did not tell Agent Slagle that Appellant had said he wanted to be arrested so he could get an attorney. In addition, Appellant was not re-advised of his Miranda rights before the post-examination interview portion of the December 2 meeting.

At the conclusion of the hearing, the trial court denied Appellant's motion to suppress. It ruled that Appellant's December 2 statement was voluntary and admissible. It specifically noted that Appellant drove to the appointment and did not request an attorney or attempt to stop the polygraph.

## B. Motion To Reopen Appellant's Motion To Suppress

Several months later, Appellant moved to reopen his motion to suppress, claiming he had discovered new evidence that suggested he invoked his right to counsel prior to the December 2 polygraph examination. In particular, Appellant cited evidence from Ralph

Foster, an acquaintance of Chief Ridenour, that the Chief told Mr. Foster he wanted to interview Appellant but could not do so because Appellant had requested counsel.

Mr. Foster, Appellant, and Chief Ridenour all testified at the motion to reopen. Mr. Foster testified that he had known Chief Ridenour for a long time and that he talked with the Chief the day the victim was killed. Chief Ridenour contacted Mr. Foster trying to locate the Appellant because Appellant had been in possession of Mr. Foster's truck. Mr. Foster also testified that Chief Ridenour continued to discuss the case with him after he contacted Appellant. Mr. Foster testified that Chief Ridenour told him that Appellant had requested a lawyer sometime around the Appellant's second interview, which occurred on November 26. Mr. Foster also testified that Chief Ridenour told him that the police could not question Appellant any further because Appellant had requested an attorney. According to Mr. Foster, the Chief explained that the police needed to either arrest Appellant or acquire more information without interviewing him. He also testified that Appellant told him he had requested an attorney.

Mr. Foster testified that during a subsequent conversation, Chief Ridenour repeated that Appellant had requested an attorney. Over the weekend between the November 26 interview and the scheduled December 1 polygraph appointment, Chief Ridenour told Mr. Foster that the police would not be able to question Appellant any further because he had requested an attorney.

After Appellant missed the December 1 appointment, Chief Ridenour again called Mr. Foster trying to contact Appellant. Mr. Foster called Appellant and informed him that Chief Ridenour wanted to talk to him about the polygraph appointment. Appellant called Chief Ridenour, and they rescheduled the appointment for the next day.

The following morning, before the rescheduled appointment, Chief Ridenour again contacted Mr. Foster. He asked Mr. Foster if Appellant intended to keep the appointment. Mr. Foster testified that Chief Ridenour informed him that Appellant would be arrested if he did not come to the appointment.

Chief Ridenour went to Mr. Foster's house on the evening of December 2, after Appellant's admission. He told Mr. Foster that Appellant had taken the polygraph and then admitted to killing the victim.

Appellant testified at the hearing. He explained that he first spoke with the police on the day the victim died, November 22. Appellant drove himself to that meeting and signed a Miranda rights waiver before the interview began. He next spoke with the police the following Friday, November 26, at Detective Breeding's office. He drove to that meeting

as well. Appellant testified that the officers did not read him his <u>Miranda</u> rights prior to this conversation. Appellant was asked to elaborate on his prior statement. He again denied any involvement in the victim's death. Appellant testified that, at that meeting, he told Detective Breeding and Officer Baker, "I think I need to talk to a lawyer." However, the conversation quickly turned to scheduling the polygraph examination, and "[w]e didn't really talk too much after that." Appellant testified that he was free to leave at any time but that he felt like he could not because there were police all around. He drove home after the meeting.

Appellant testified that when Detective Breeding contacted him after he missed the polygraph appointment on December 1, Appellant again said he wanted to talk to a lawyer. According to Appellant, Detective Breeding then "beat around the bush" and told Appellant that he was going to set up the polygraph for the next day. Appellant did not try to talk to an attorney before the polygraph.

Appellant drove himself to the December 2 polygraph appointment. Several officers were present. Appellant signed a <u>Miranda</u> waiver form and took the polygraph. After the examination, Appellant admitted killing the victim.

Appellant testified that he told the police he "guessed [he] needed a lawyer" twice before he ultimately admitted killing the victim. The first occasion was in the November 26 meeting. The second was during the December 1 telephone conversation with Detective Breeding.

At the conclusion of Appellant's testimony, the court denied Appellant's motion. It found nothing new to justify changing its prior decision. After further argument from counsel, however, the court retracted its ruling in order to hear testimony from Chief Ridenour regarding whether he threatened to arrest Appellant if he did not appear for the December 2 appointment.

Chief Ridenour testified that he called Mr. Foster trying to get in touch with Appellant after he missed the December 1 appointment. He also testified that he did not set up the second appointment and did not recall if it was set up before he spoke with Appellant. Chief Ridenour did not recall telling Mr. Foster that he would arrest Appellant if he did not show up for the second appointment, although he acknowledged that he may have said he could. Regardless, he did not intend to arrest Appellant if he did not appear for the December 2 polygraph. He also testified that he did not recall speaking with Appellant between the initial November 22 interview and the December 1 telephone conversation with Mr. Foster. Chief Ridenour was not present during the December 2 polygraph or subsequent interview. He said he met and talked with Appellant "as a friend" after Appellant made his admission.

At the conclusion of the hearing, the court denied Appellant's motion. It found nothing in the new evidence to contradict its original finding that Appellant voluntarily appeared for the polygraph and gave a knowing and voluntary admission. It discounted Mr. Foster's testimony, finding that because none of the evidence in either suppression hearing indicated that Chief Ridenour was present during Appellant's interviews, any information Mr. Foster received regarding Appellant's request for counsel was at best second-hand and therefore unreliable. Moreover, it credited Chief Ridenour's testimony that he did not recall threatening to arrest Appellant if he failed to show up for the December 2 polygraph. In other words, the court found that Chief Ridenour did not coerce Appellant to appear for the polygraph and the subsequent interview. As a result, the court found the Appellant's statement was voluntary and admissible.

## C. Trial

Appellant was tried by a jury in December 2006. The State's first witness was the victim's sister, Sandra Russell. She testified that the victim was forty-five years old, worked in various odd jobs, and lived at their parents' old house in Anderson County. She further testified that she knew Appellant. She recalled that Appellant and the victim worked together years earlier.

The State's second witness was Wiley Maloney, a patrol deputy with the Anderson County Sheriff's Department. At the time of the victim's death, Officer Maloney had worked full-time with the Anderson County Sheriff's Department for two years.

Officer Maloney responded to the victim's vandalism report on the morning of November 22. He arrived to find two cars parked in the victim's driveway. Both had their driver's side tires slashed with a knife. The victim and Ms. Cooper were present and said they saw Appellant getting into a red SUV at the end of the victim's driveway at 2:30 a.m. that morning. They went to bed, and Ms. Cooper discovered the slashed tires when she left for work later that morning. Officer Maloney took the report and left the scene at approximately 8:15 a.m. He described the victim as "upset" about the tires.

He was called back to the victim's house at around 11:45 a.m. This time, he found the victim slumped over a tire jack near the flat rear tire of the truck. The victim had no pulse, was cold and clammy, and had a trauma injury on the left, rear side of his skull, behind his ear.

The State next called Amy Wood to testify. Ms. Wood, a paramedic with the Anderson County EMS, was dispatched to the victim's home around 11:40 a.m. on November 22. When she arrived, she found the victim curled over a jack and against the

wheel of a truck. He had no pulse and had already started to stiffen. His eyes were not responsive. She noticed a pool of blood under his face and dried blood around his left ear. Ms. Wood also noticed that there was a jacket on the ground near the victim, but she did not move the jacket and did not know if there was anything underneath it.

Lois Foust, Ms. Cooper's neighbor, testified that she and Ms. Cooper discovered the victim's body. Ms. Cooper came to Ms. Foust's house at around 10:00 or 10:30 a.m. on November 22 and asked for a ride to the victim's house. Ms. Foust agreed to take her. When they arrived at the victim's house, Ms. Foust got out and saw the victim on the ground, unresponsive. She called 911 and tried to console Ms. Cooper until the police arrived.

The State's next witness was Ms. Cooper. She testified that she dated Appellant from 1996 until 2001 and that she lived with him for much of that time. Ms. Cooper described Appellant as generally "pretty calm" and "peaceful." Appellant introduced Ms. Cooper to the victim in 2001, when he was Appellant's co-worker. In 2002, after her relationship with Appellant ended, Ms. Cooper began to date the victim and eventually moved in with him.

Ms. Cooper testified that Appellant got into a fist fight with the victim shortly after she moved in. After the fight, Ms. Cooper did not see Appellant romantically until 2004.

Ms. Cooper's relationship with the victim "cooled off" about three months before his death because the victim was mad at her. Although they were no longer living together when the victim was killed, they had continued to see each other. At the same time, Ms. Cooper began seeing Appellant. He stayed at her house a few nights in the months leading up to the victim's death. Appellant sold his car to help her purchase a used Camaro.

Ms. Cooper testified that she went to the victim's house twice on November 21. She first went around 1:00 p.m. The two had coffee, and she went home. She went back to the victim's house around 9:00 p.m. Ms. Cooper testified that the victim heard something outside the house early in the morning of November 22. He looked outside and saw a red Pathfinder, the same kind of car Appellant's acquaintance drove. Ms. Cooper did not look. They watched television and then went to bed between 2:00 and 3:00 a.m.

They got up around 7:00 a.m. When Ms. Cooper went out to warm up her car before leaving, she discovered that four of their tires had been slashed. Ms. Cooper testified that the victim called the police to file a report, and Ms. Cooper called her daughter to get a ride home. As Ms. Cooper left the victim's house around 8:30 or 9:00 a.m., he was getting the equipment together to fix the tires. Ms. Cooper testified that the victim was upset and that he blamed Appellant for the vandalism.

About 9:15 a.m., Ms. Cooper received a telephone call from Pat McGhee asking if Ms. Cooper had talked to the victim. Ms. Cooper was not alarmed by the call, but eventually she tried to call the victim. He did not answer any of her three calls. Ms. Cooper was still not alarmed because it was not unusual for the victim to not answer his telephone.

Ultimately, Ms. Cooper decided to check on the victim. She got a ride to the victim's house from Ms. Foust, and they discovered the victim's body.

The State then called Ms. Cooper's daughter, Latasha Cooper.[2] In November 2004, Latasha was living with her mother. She testified that Appellant called the Coopers' house repeatedly on the night of November 21, wanting to talk to Ms. Cooper. The calls started around 8:30 p.m. and continued until around 2:30 or 3:00 a.m. Each time, Latasha told Appellant she did not know where her mother was. She acknowledged that she was not telling Appellant the truth; she knew her mother was at the victim's house. Appellant persisted, accusing Latasha of lying to him, but Latasha continued to claim ignorance.

About 7:30 or 7:45 a.m. the next morning, Latasha received a call from her mother asking for a ride home from the victim's house because her tires had been slashed. Latasha testified that when she arrived at the victim's house, both the victim and Ms. Cooper seemed to be fine. The victim asked Latasha if her boyfriend could help him get replacement tires. Around 9:00 a.m., after Latasha and Ms. Cooper left, Latasha called the victim's home to let him know that her neighbor had some tires the victim might be able to use. The victim did not answer his telephone.

Latasha left her house a little later. When she returned, she found a message to call Ms. Foust. She did, and when Ms. Foust picked up the telephone, Latasha could hear her mother screaming in the background. At that point, Latasha went to the victim's house.

Latasha testified that she and her boyfriend had helped Appellant move some items into a trailer about a week before the victim's death. After they finished moving the items, Appellant told Latasha that the victim "wasn't going to whoop his a[**] again." He also told Latasha that she "would visit [the victim] at the graveyard." Latasha noted that they "weren't talking about [Appellant] getting his butt whipped or nothing like that." Instead, the comments were unprompted.

Latasha also recalled seeing Appellant a few days after his 2002 fight with the victim. Appellant was badly beaten.

---

[2] Because Lisa and Latasha share a surname, the Court refers to Lisa as "Ms. Cooper" and Latasha by her first name for clarity.

Finally, Latasha testified that Appellant had stayed at the Coopers' house only once during Ms. Cooper's "cooling off" period with the victim. She explained that Appellant stayed there because he had too much to drink and that he slept on the living room floor.

The State next called Patricia McGhee. Ms. McGhee had known Ms. Cooper since 1995, and she testified that they were "very close friends." In addition, she had known the victim all his life and had known Appellant longer than she had known Ms. Cooper. She testified that both Appellant and the victim "were . . . good friends of mine." Ms. Cooper was dating Appellant when Ms. McGhee met her. Ms. McGhee testified that Ms. Cooper and the victim began to date while the victim and Appellant were working together, sometime around 1999 or 2000.

Ms. McGhee testified that both Ms. Cooper and Appellant were at her house on November 21. A dispute arose between the two, and Appellant told Ms. Cooper that he loved her. Ms. Cooper told Appellant that she did not love him. Ms. McGhee characterized the conversation as "civil." Ms. McGhee testified that, although she was not certain, she believed Ms. Cooper left before dark.

Ms. McGhee also testified about seeing Appellant after his fight with the victim over Ms. Cooper. Ms. McGhee was a nurse, and Appellant came to her for first aid. She described him as "severely beaten" and "hurt real bad." Ms. McGhee cleaned Appellant's wounds, and he drove home. Ms. McGhee noted that Appellant and the victim "had go-arounds a lot," meaning that "[t]hey had other fights." She also testified that she had heard both Appellant and the victim threaten violence against the other, such as "I'm going to kill [the victim]" or "I'm going to kill [Appellant]." Most of Appellant's comments came after he learned about disputes between the victim and Ms. Cooper.

Ms. McGhee recalled that Appellant helped Ms. Cooper purchase a used Camaro a few months before the victim's death. She also recalled that Ms. Cooper had commented that Appellant would kill her if he found her car at the victim's house.

Appellant called Ms. McGhee around 9:15 a.m. on November 22. He asked if she had heard that the victim had been shot; she said she had not. Ms. McGhee testified that Appellant's voice sounded normal and that he said he did not know who shot the victim. Ms. McGhee called Ms. Cooper and told her what the Appellant said. Ms. Cooper did not believe her, but she told Ms. McGhee about the slashed tires. About fifteen minutes later, Appellant called Ms. McGhee again and said someone had shot the victim. Ms. McGhee told Appellant that she had talked with Ms. Cooper and that Ms. Cooper had told her about the tires. Ms. McGhee testified that Appellant did not respond to her comment and did not deny slashing the tires; however, he denied shooting the victim.

-14-

After Appellant's second call, Ms. McGhee told her son to go to Ms. Cooper's house and take her to check on the victim. Ms. Cooper refused to go.

Around 11:00 a.m., Appellant showed up at Ms. McGhee's house. He was driving his mother's car. Ms. McGhee testified that Appellant acted normally and that he told her about a conversation he had with the victim that morning. Appellant told her that the victim said he "got [Appellant's] woman and [the victim was] going to kill [Appellant] and stretch [Appellant's] body parts over this fence." Ms. McGhee noted that it would not be unusual for the victim to make such a comment and that the victim had a similar response to a previous incident in which Appellant slashed Ms. Cooper's tires.

Detective Breeding was the next witness. He testified that he arrived at the victim's house after lunch on November 22. He saw a quilted shirt draped over a four-way lug wrench within three feet of the victim's body. He also saw that a hub cap had been removed from the wheel near the victim's body and that it contained lug nuts and caps. Additionally, some of the lug nuts on the wheel were noticeably loosened and the jack was secured under the car, which may have been slightly raised.

Detective Breeding discovered a bullet hole in the rear wheel well on the driver's side of the Camaro. There was also a chip of what appeared to be the Camaro's paint on the ground near the bullet hole, indicating that the hole was "fresh." Based on Detective Breeding's measurements, he concluded that the shot that hit the Camaro would have been fired from approximately 15 feet away, which would be in the street, at about car-door height.

Detective Breeding testified that he found blood at the scene but only in the vicinity of the victim's body. Based on Detective Breeding's measurements, the victim's body was approximately 44.5 feet from the street, where Appellant said he was when he fired.

Detective Breeding retrieved a cellular telephone from the victim's house during his investigation. The telephone did not belong to the victim. He examined the incoming, outgoing, and missed call logs, and he conducted the same examination on Appellant's telephone. He concluded that the victim called Appellant on November 22 from the telephone found by Detective Breeding. Appellant told Detective Breeding that he called the victim back, but the victim did not answer. Detective Breeding's examination of the victim's telephone revealed an outgoing call to the Appellant at 9:13 a.m. He noted that there was a "*67" entered before that number, which Detective Breeding explained was a method to activate a caller ID blocking function on the recipient's telephone. In other words, the victim called the Appellant but dialed the number so that Appellant could not identify who was calling him prior to answering.

In addition, Detective Breeding was informed during his investigation that the victim owned a .38 caliber Smith & Wesson and a .22 caliber Colt Peacemaker. He did not see either gun, but he discovered a little more than $1000 in the victim's pants pocket.

The investigation quickly turned to Appellant. Detective Breeding met with Appellant on the day of the murder. He testified that he met with Appellant on two other occasions, once in November and once on December 2, and that he spoke with him over the telephone on December 1. During the November 22 meeting, Detective Breeding read Appellant his Miranda rights, and Appellant signed a waiver of those rights and gave a statement denying involvement in the death. Detective Breeding noted that the November 22 statement was summarized in writing. During the December 2 meeting, Detective Breeding was present when Agent Slagle read Appellant his Miranda rights. Again, Appellant signed a waiver and made a statement. The writing memorializing Appellant's statement was not verbatim. Detective Breeding testified that during his discussions with Appellant, Appellant told him that the victim had threatened to "stretch [Appellant's] balls over a barbed-wire fence" during the telephone conversation on November 22.

The State next called Dr. Cleland C. Blake to the stand. Dr. Blake, a forensic pathologist, performed the autopsy on the victim. Dr. Blake had worked in pathology since the 1960s and had conducted more than 6,000 autopsies in his career. The court accepted Dr. Blake as a forensic pathology expert without objection.

Dr. Blake testified that the victim had several perforating gunshot wounds, which have both entry and exit points, and several penetrating wounds, which have only an entry point. The victim's head had two penetrating wounds. The first shot entered the back, left side of the victim's head, behind his ear. The second entered the victim's forehead above his left eye. The bullet traveled diagonally through the victim's head. Dr. Blake recovered both bullets in the victim's head. He testified that the victim would have been largely incapacitated after suffering these wounds. He would not have been able to move or walk, except to stumble forward and fall to the ground; he would not have been able to think; and even with immediate care he would likely have lived less than two minutes.

The victim also suffered wounds to his chest and abdomen. One shot entered on the left side of the victim's body and then exited just above his belly button. Another shot entered his abdomen above the victim's belly button on his right side. This shot punctured the victim's bowels and hit his mesentery artery. Dr. Blake testified that the wound would have caused significant bleeding and that the victim would have bled to death without quick medical attention.

The victim's back had three entry wounds in almost a straight line from his shoulder blade to the top of the right buttock. The first hit the victim's liver, the second went into soft tissue, and the third entered the soft tissue in the victim's buttock and stopped near the victim's spine.

The victim also had a compression mark on his arm consistent with falling on a jack.

Dr. Blake testified that his autopsy revealed the victim's death was caused by multiple gunshot wounds to the head, thorax, and abdomen. He recovered two .22 caliber bullets intact and two deformed .22 caliber bullets. He was not able to determine which shot hit the victim first, but he believed the first shots were probably to the head. The victim died from the loss of blood resulting from his injuries, and Dr. Blake classified the death as a homicide.

Dr. Blake requested a toxicology report for the victim. The results indicated that the victim had a low level of marijuana in his body, which Dr. Blake testified would have had a "[v]ery minimal" affect on his cognition. The victim did not have any alcohol or other toxins in his bloodstream.

On cross examination, Dr. Blake acknowledged that his findings were not inconsistent with Appellant's claim that he shot the victim from the road as the victim approached him. During his testimony, the State introduced Dr. Blake's autopsy report into evidence.

At the conclusion of Dr. Blake's testimony, the State called Shelley Betts. Ms. Betts, a Special Agent with the TBI, testified that she was employed at the Bureau's crime laboratory in Nashville. She is a forensic scientist and is assigned to the TBI's Firearms Identification Unit. The trial court accepted her as a "firearms" expert without objection.

Agent Betts examined five bullets and three lead fragments in this case. She determined that the bullets were all .22 caliber and that they were all fired from the same gun. She did not identify the fragments. Based upon the rifling grooves on the bullets, she was able to narrow the list of possible models and manufacturers and exclude the victim's .22 caliber Colt Peacemaker. Agent Betts did not, however, analyze any particular guns.

Agent Betts also examined the six bullet holes in the victim's shirt. Although she could confirm that the holes were caused by bullets, she did not find any other discharge particles around the holes that would indicate a close proximity to the weapon. In other words, she could not discern how close the shooter was to the victim when the shots that caused the six holes were fired.

The defense began by calling Mr. Foster, who said he had known both Appellant and the victim for about 35 years. He recalled that Appellant and the victim had previously worked together and had also been roommates from time to time. He noted that they stopped living together after they got into a dispute over Ms. Cooper. Mr. Foster testified that the victim had a reputation for "fighting" and "being violent" and that Appellant was aware of that reputation. According to Mr. Foster, Appellant did not have a reputation as a violent person.

Mr. Foster testified that he was in Alaska the week before the victim's death. While he was away, he allowed Appellant to use his truck because Appellant's truck was not working. Mr. Foster returned on November 21, the day before the victim's death. On the morning of November 22, Chief Ridenour called Mr. Foster to ask if he had seen Appellant and if Appellant still had Mr. Foster's truck. Mr. Foster told Chief Ridenour that, as far as he knew, Appellant still had his truck. However, Mr. Foster had not gotten up for the day, so he did not know if the truck had been returned.

Appellant next called his mother, Argie Bell, to testify. Ms. Bell testified that she had known the victim since he was in high school. The victim and Appellant were friends, and they occasionally worked together. Ms. Bell described their friendship as steady and noted that the victim named his son after Appellant. Ms. Bell also noted that the two got into a fight in November 2002, after the victim started dating Ms. Cooper. Ms. Bell testified that after the fight, Appellant "looked like he had been through a grinder" because "[h]is face was mush." Ms. Bell encouraged Appellant to see a doctor, but he instead sought treatment from Latasha Cooper.

After the fight, Appellant moved to Florida. Ms. Bell testified that she did not know what Appellant did there. He stayed from November 2002 until February 2003, when Ms. Bell called Appellant and told him to return because his vehicles were being repossessed and he had lost his job. Appellant returned, but he could only obtain "[o]ff and on" employment.

Ms. Bell testified that Appellant did not have any contact with the victim after he returned. Appellant had some relationship with Ms. Cooper, but Ms. Bell did not elaborate.

Appellant was living with Ms. Bell in November 2004, but he started renting a trailer several months earlier. Although Ms. Bell never went to the trailer, she believed he had taken some furniture there and sometimes stayed there.

Ms. Bell also testified that Appellant had a relationship with Ms. Cooper in November 2004. Ms. Bell never saw Appellant and Ms. Cooper together, but he brought Ms. Cooper's grandchildren to the house to play.

-18-

Ms. Bell went to bed at 10:30 p.m. on the night of November 21. Appellant was not home, but he was in his bed when Ms. Bell awoke around 6:00 or 6:30 a.m. on November 22. Ms. Bell believed that after he woke up around 7:00 or 7:30 a.m., Appellant returned Mr. Foster's truck and came home. Appellant was at the house when Ms. Bell left for a water exercise class around 8:30 or 8:45 a.m. Ms. Bell noticed nothing unusual about his demeanor.

Ms. Bell returned from her class between 10:15 and 10:30 a.m. Appellant entered the house right after she returned. As he entered, he asked to drive Ms. Bell's car to work. Ms. Bell agreed and went back to bed. Appellant did not tell her about the telephone call he received from the victim, and she testified that Appellant did not look disturbed or upset.

Around lunchtime, Chief Ridenour came to Ms. Bell's house looking for Appellant. He informed Ms. Bell that the victim was dead, and Ms. Bell responded that Appellant could not have killed him because the two were friends.

Appellant's next witness, David Pratt, had known Appellant for several years. The two met during a construction project around 1998. Mr. Pratt also knew the victim, with whom he had worked on a construction project around 2000. Mr. Pratt hired the victim on Appellant's recommendation, and he never saw any trouble between the two.

Mr. Pratt recalled a confrontation he had with the victim when they worked on a job at the end of 2000. Mr. Pratt was giving the victim some training in carpentry and asked the victim to join him for a project in New Jersey. Appellant was not with them. Two teenagers assisted on the trip. Mr. Pratt testified that he paid for the teenagers' hotel room and gave them spending money. As the project progressed, Mr. Pratt noticed the teenagers were having difficulty showing up on time and completing their tasks. He later discovered that the victim had been taking the teenagers out at night for drinks. Mr. Pratt confronted the victim and told him to leave the project. Mr. Pratt testified that the victim, who was standing on a scaffold during their conversation, jumped off the scaffold and "tried to take his thumbs and stick them in my eyeballs, pull out my eyeballs, and tried to severe [sic] my nose with his mouth." Mr. Pratt fended him off until others broke up the fight.

Mr. Pratt testified that he had previously seen similar conduct from the victim. He noted that when the victim "didn't get his ways he got aggravated . . . if he thought he was right." Mr. Pratt testified that the victim appeared to have "two personalities."

Mr. Pratt did not work with the victim again after the New Jersey incident. The victim was hired by the company for whom Mr. Pratt worked, so Mr. Pratt quit. He did not have any further contact with the victim.

Appellant was the last witness at trial. He testified that he was 48 years old and that he had known the victim since the seventh grade. Appellant quit high school his senior year, got a GED, and joined the Navy. He served for four years, was honorably discharged, and returned to Tennessee. Upon returning, his friendship with the victim continued. Appellant got married around 1981. The victim, however, got married around the time he graduated from high school. Both the victim and Appellant later divorced and never remarried. The victim had two children, a girl and a boy. Appellant testified that he was godfather to the victim's son, whom the victim named after Appellant. Appellant testified that he did not remember the child's middle name or his date of birth. However, Appellant testified that he got the child birthday presents and birthday cards "two or three times." In addition, Appellant stated that he considered a godfather to be a type of role model, but he did not provide any specific examples of things he did with the child. The child died around 2005.

Appellant testified that he dated Ms. Cooper in the mid-1990s. They met through an acquaintance who was dating one of Ms. Cooper's friends. Appellant and Ms. Cooper lived together for five or six years. Appellant asked Ms. Cooper to marry him, but she responded that "she'd have to think about it" because "she didn't want to lose her [disability] benefits." Ms. Cooper never gave him a more specific answer.

Near the end of the relationship, Appellant became suspicious that Ms. Cooper and the victim were "sneaking around" together. After about six months, they revealed their affair to Appellant. About three and a half years before the victim's death, Appellant slashed Ms. Cooper's tires when he discovered her car at a motel. He testified that he did so because he "wanted her to know . . . that [he] knew something was going on." Appellant stated that he did not know if Ms. Cooper was with the victim during that episode.

Appellant and the victim worked together for a company that required some travel. After a work trip, the victim admitted that he had been seeing Ms. Cooper. Appellant and Ms. Cooper broke up by "kind of a mutual agreement," but Appellant later testified that Ms. Cooper broke up with him so she could continue to date the victim.[3] The victim then quit working for the company. Appellant explained that he was more hurt than mad at the revelation and that he "just went on about [his] business."

Appellant testified that he and the victim got into a fight in 2002. Leading up to the fight, Appellant had contact with Ms. Cooper every two or three months. The contact was usually when she was frustrated with the victim. After one such episode, Appellant decided to go to the victim's house to discuss it. Appellant admitted that he had been drinking but

---

[3] Appellant acknowledged that this testimony conflicted with his statement to the police that he broke up with Ms. Cooper "because [he] got tired of hearing her."

denied that he was drunk, even though "if you'd give[n him] a blood alcohol test [he] probably would have been." The meeting turned into an argument over "pretty much . . . just . . . the whole situation; the work, the business, [Ms. Cooper] . . . our friendship." Appellant testified that the victim got ready to fight, and Appellant turned away. When he turned, the victim hit him. Appellant did not know how long the fight lasted, but he "took several licks and then went down, and after [Appellant] was on the ground [the victim] beat [Appellant] pretty good." The victim beat him with a Bic lighter and kicked his face while he was on his hands and knees. Appellant testified that he still had scars from the fight.

After the fight, Appellant got up, washed his face in the yard, and drove to his mother's house. Latasha Cooper took him to Ms. McGhee's house to get cleaned up.

Appellant said that a few days later, depressed and in disbelief, he went to Florida. He wanted to get away, and he learned that he might get a job in Jacksonville.

The victim called Appellant around the time he went to Florida. The conversation was not an argument, but it was not pleasant, and the victim threatened him.

Upon arriving in Florida, Appellant got "bad sick" with "a cold-type thing." He also "felt drained and . . . couldn't work no more." He ultimately lost his job and returned to Tennessee. In total, Appellant spent about two or three months in Florida after the fight.

When he returned to Tennessee, Appellant filed for bankruptcy and obtained some part-time work hanging drywall. He was living with his mother, and, as far as he knew, Ms. Cooper and the victim were still together.

Appellant testified that he and the victim were also in contact during 2003 and 2004. The two worked together, and Appellant stayed at the victim's house.

Appellant had "on and off" contact with Ms. Cooper during this time. Most of this contact was over the telephone or through Ms. McGhee, including meetings at Ms. McGhee's house.

Appellant testified that Ms. Cooper and the victim broke up two or three times during the years they were together. During most of those hiatuses, Appellant and Ms. Cooper began seeing each other again, often reuniting through Ms. McGhee.

In the fall of 2004, Appellant and Ms. Cooper began to see each other again. Appellant spent the night at Ms. Cooper's house a few times. He denied that he slept on the floor each time. Appellant also rented a trailer, and he and Ms. Cooper discussed moving

into the trailer together. Appellant helped Ms. Cooper buy a used Camaro. He paid for all but $500 of it; Ms. Cooper contributed the rest.

Appellant also testified about the events leading to the victim's death. Appellant said that he was with Ms. Cooper at Ms. McGhee's house on either November 20 or 21. He testified that the meeting was to discuss Thanksgiving plans.

> Appellant admitted that he cut the victim's and Ms. Cooper's tires. He said he did it [b]ecause they was a lot of other things that went on that personal property damage that I received from [Ms. Cooper], and just the way she'd always get to me, I wanted her just to leave me alone. And, actually, [the victim] owed me a little money from this work we had done. We had bought [sic] in all kinds of materials and supplies and stuff that was left over, carpet, and I had stayed at [the victim's] house quite a bit and when I asked him about some of these things he said it was all gone. In other words, he was just going to keep it.

Appellant testified that he believed slashing the tires would get Ms. Cooper to leave him alone. He was not concerned with the effect it would have on the victim. Appellant also admitted that prior to slashing the tires, he drank a "couple" of beers and took a Valium, which he obtained from Ms. Cooper the night before.

Appellant was driving Mr. Foster's truck because he had been moving his furniture from Ms. Cooper's house. Appellant checked on Mr. Foster's house for him while he was in Alaska. In exchange, Mr. Foster let him drive the truck because Appellant's truck was not working.

After Appellant slashed the tires, he went home and went to bed. He woke up around 7:00 or 7:30 a.m., went to the store where he bought a pack of cigarettes and a cup of coffee, and returned to his house.

He was stretched out on the bed waiting for his mom to come home when the victim called. The caller I.D. on his cellular telephone did not indicate who was calling, but he answered. The victim was on the line and "was real upset." Appellant testified that the victim told him that Appellant's "balls were going to be cut off and shut in [his] mouth and [the victim] was going to stretch [his] a[**] across the fence where [Appellant's] mom could come home and find [him]."[4] Appellant recalled that he was "kind of in disbelief through

---

[4] Appellant testified that he quoted the victim's statement to the officers when he gave his December

(continued...)

this whole thing because [he] thought [he] and [the victim] was real close." He tried to call the victim back, but the victim did not answer. At that point, Appellant decided to go to the victim's house to "talk to [the victim] and kind of just straighten all this crazy back and forth." Appellant said that he felt like what had happened was the "betrayal of a good friend." Appellant did not want to be beaten again, so he took a gun and some bullets he had recently acquired. Appellant testified that he purchased the gun in the months prior to the victim's death for $20.[5]

Appellant drove Mr. Foster's truck to the victim's house. He pulled up to the end of the driveway and turned off the motor. The victim was at the rear of his truck when Appellant arrived. As Appellant started to get out of the truck, the victim "was either standing up or moving up." Appellant testified that "[a]s soon as I started getting out I seen the look in [the victim's] eyes and he was raising that lug wrench up and [the victim] said those words about telling lies and he stole my pussy and, you know, I just kind of freaked out." Appellant leaned into the truck and retrieved his gun, which was lying on the passenger side. He turned back around, and out of his peripheral vision saw the victim "a lot closer than what he was when [Appellant] first seen him." Appellant testified that the victim was moving toward him with a quick step. Appellant did not recall the victim's saying anything else. The victim was "between four and six feet" from Appellant, and he had raised the lug wrench when Appellant ducked down and started shooting. Appellant noted that because he was holding the gun away from his body, the barrel of the gun would have been a foot closer than his estimate. Appellant did not know how many times he fired. Appellant testified that the victim was able to walk all the way back to the rear wheel. Appellant started to walk toward the victim "because he was down" but then got back in the truck and left.

Appellant noted that the jacket found on top of the lug wrench was not his nor did he recall seeing the victim wearing it. Appellant testified that the victim liked to carry a .22 caliber automatic pistol with him when he was working and that he "always" had a gun with him when he was traveling for work.

Appellant testified that he did not go to the victim's house intending to shoot him. He denied making threatening comments about the victim to Latasha Cooper. Appellant believed that the victim "was fixing to whip" him. He explained that, because of "the way [the victim] was coming at [Appellant] and the look in [the victim's] eyes," Appellant

[4](...continued)
2 statement, but he did not insist on it being in the memorialized version.

[5] This conflicts with his December 2 statement that he received the gun in exchange for a ride. But both are consistent that Appellant thought the gun was stolen. Appellant testified that he purchased the ammunition from Wal-Mart around the same time.

believed that it "would have been more than a whooping." Appellant described the victim as having a "wild look" in his eyes, and his voice was "stern" and "loud." Appellant testified that he had seen the same look in the victim's eyes during their previous fight. Appellant further testified that he "really [did not] know" why the victim would want to be so violent toward Appellant "all of the sudden," given their friendship. However, Appellant said that the victim "was a funny-type guy and . . . he liked to fight. . . . He had a little bit of bully mind set thing . . . but [Appellant] thought [their] friendship went a lot further than that."

After Appellant shot the victim, he threw the gun in the Clinch River. He testified that he did so "[b]ecause [he] didn't want it"; he "wasn't thinking about the police." Thereafter, he returned home and then went to Ms. McGhee's house. He did not recall telling Ms. McGhee that the victim had been shot, but he recalled telling her the victim had been hurt. Appellant claimed he said the victim was hurt to get her to help the victim. He did not tell her that he hurt the victim. Appellant also visited another friend but did not tell him that he killed the victim. Appellant did not call the police or other authorities to help the victim.

Later that day, Mr. Foster called Appellant to tell him that Chief Ridenour was looking for him. Appellant agreed to meet Chief Ridenour at a local grocery store. From there, Appellant and Chief Ridenour went to the Anderson County detectives' office, where Appellant changed into a jail uniform prior to his interview. Appellant testified that the police did not ask him if he had shot the victim. Instead, they simply wanted Appellant to recount his day's activities. Appellant did, but he "left out" the part about going to the victim's house. Appellant signed a statement summarizing what he told the officers. A few days later, Appellant threw away some bullet shells.

The defense rested at the conclusion of Appellant's testimony. According to the record, the trial court gave the parties a draft of the court's proposed jury instructions the day before the close of the defense's case. The parties were given an opportunity to object, comment, and propose changes to the instructions. The State declined the opportunity. Appellant objected to the sequential instruction that required the jury to consider the lesser-included offenses only after they had agreed Appellant was not guilty of each greater charge. He also objected to the court's reiterating the sequential determination instruction in the jury verdict forms. Finally, he objected to instructing the jury on the various charges but not instructing it regarding the possible ranges of punishments associated with those charges. The trial court overruled each objection.

At closing, each party gave its theory of the case. The State argued that the victim was standing at the jack, more than forty feet away, when he was shot. It noted that there was no blood anywhere other than around where the victim's body was discovered. It also noted that the lug wrench was covered by Appellant's jacket. It thus argued that Appellant's

-24-

theory that the victim approached him with the lug wrench, was then shot, and returned to the jack after putting the lug wrench down was implausible, especially in light of Dr. Blake's testimony that the victim would not be able to do much after suffering the shots to his head. Appellant maintained that Dr. Blake's testimony was "not inconsistent" with his theory.

The trial court then instructed the jury on the case. With respect to the instructions given to the jury, the record is far from clear. There are two sets of instructions in the record. The first is contained in the trial transcript but is not in the standard transcript format. The second, which is located in the exhibits to the case, is signed and contains an exhibit marker.

The exhibit version contains some case-appropriate instructions that are absent from the transcript version. It also omits some inappropriate instructions that are contained in the transcript version. First, the transcribed version contains an instruction regarding how to evaluate the fact that a defendant did not testify. The exhibit version, on the other hand, omits this instruction but includes an additional paragraph in the "credibility" instruction directing the jury to evaluate Appellant's testimony as it would any other witness. Notably, the transcript version has the same instruction in addition to the "Defendant: Not Testifying" instruction. Second, the transcript version contains an instruction about "confessions," whereas that instruction is omitted in the exhibit version and replaced by an instruction about an "admission against interest." Finally, the exhibit version also contains a self-defense instruction, which is absent from the transcript version.

Both sets of instructions contain the "sequential" jury instruction. Similarly, both sets contain an instruction about stipulations which indicates that the parties reached a stipulation regarding Agent Betts's testimony. However, Agent Betts testified, and the transcript does not indicate the parties stipulated to any other testimony she would have provided.

After concluding its deliberations, the jury found Appellant guilty of first degree premeditated murder. Because the State did not seek the death penalty or life without parole, the trial judge immediately sentenced Appellant to life in prison, as is required by state law.

Appellant filed a motion for a new trial, which the trial court denied after a hearing.

Appellant now appeals, raising six issues: (1) the trial court erred in refusing to suppress Appellant's December 2, 2004 statement to the police; (2) the evidence was insufficient to sustain the conviction as a matter of law; (3) the trial court erred in admitting the entire autopsy report; (4) the trial court erred by including the sequential charge to the jury; (5) the trial court erred by reiterating the sequential instruction in the verdict forms; and (6) the trial court committed plain error by indicating to the jury in the instructions that

Appellant's December 2, 2004 statement was a "confession" and by failing to instruct the jury on self-defense.

## II. Analysis

### A. Suppression

We begin with Appellant's suppression argument. Appellant contends he requested counsel twice prior to giving his December 2 statement, but investigators nevertheless pursued the polygraph. According to Appellant, their continued pursuit violated his rights to counsel, and therefore the trial court erred in denying his motion to suppress the December 2 statement.

In reviewing a trial court's determinations regarding a suppression hearing, "questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Turner, 305 S.W.3d 508, 514 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)) (brackets and quotation marks omitted), cert. denied, 78 U.S.L.W. 3644 (U.S. June 7, 2010). Thus, "the trial court's findings of fact in the suppression hearing should be upheld unless the evidence preponderates to the contrary." Id. (citing State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009)). Appellate courts review the trial court's application of law to the facts purely *de novo*. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); see also Turner, 305 S.W.3d at 514. The State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

Tennessee Rule of Criminal Procedure 12(e) requires that trial courts state their essential findings on the record in matters where the resolution of factual issues are critical to the decision. See State v. Williams, 185 S.W.3d 311, 314 n.2 (Tenn. 2006). This court does not have jurisdiction to make such factual findings, determine credibility, or weigh evidence. See Tenn. Code Ann. § 16-5-108; see also Duncan v. Duncan, 672 S.W.2d 765, 767 (Tenn. 1984); State v. Williams, 52 S.W.3d 109, 121 (Tenn. Crim. App. 2001). But where, as here, the record is sufficiently developed to allow our review of the issues presented on appeal, "we proceed with a *de novo* review of the law applicable to the facts viewed in the light most favorable to the State." State v. James Robert Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *6 (Tenn. Crim. App. at Knoxville, Aug. 28, 2000). Moreover, "appellate courts may consider the proof adduced both at the suppression hearing and at trial" in evaluating the trial court's decision. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination. See Turner, 305 S.W.3d at 515; see also Maryland v. Shatzer, 130 S. Ct. 1213, 1219 (2010). In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court held that, to safeguard the Fifth Amendment right against self-incrimination, law enforcement officials must inform a defendant of his constitutional rights prior to commencing an interrogation. See Turner, 305 S.W.3d at 515-16. An accused may waive those rights so long as the waiver is voluntarily, knowingly, and intelligently made. See Callahan, 979 S.W.2d 577, 581 (Tenn. 1998); see also Shatzer, 130 S. Ct. at 1219. But regardless of whether the Miranda warnings are given, once someone requests an attorney, the interrogation must cease and the person may not be subjected "to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Minnick v. Mississippi, 498 U.S. 146, 150 (1990) (quotation marks omitted); see also Shatzer, 130 S. Ct. at 1219; Turner, 305 S.W.3d at 515-16.

The trial court concluded that Appellant waived his right to counsel and therefore his December 2 statement should not be suppressed. We agree. In addition, we also conclude that Appellant never invoked his right to counsel. Therefore, the trial court did not err in denying Appellant's motion to suppress.

### 1. Whether Appellant was in custody

Miranda warnings are necessary only in situations involving custodial interrogation or its functional equivalent. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); Turner, 305 S.W.3d at 515-16; State v. Dailey, 273 S.W.3d 94, 101-04 (Tenn. 2009). The parties spent a significant amount of time disputing whether Appellant was "in custody" for Miranda purposes. We conclude that matter is inconsequential. Whether an interrogation is "custodial" determines whether the interrogators are *obliged* to give a Miranda warning. See R.D.S. v. State, 245 S.W.3d 356, 363 (Tenn. 2008); State v. Anderson, 937 S.W.2d 851, 851-52 (Tenn. 1996). In this case, Appellant was given his Miranda rights several times, including immediately before the polygraph and the subsequent inculpatory statement. Indeed, the statement at issue specifically refers to his Miranda rights. So, in the context of this case, it is immaterial whether Appellant was "in custody" when he gave his statement; he was given the Miranda warning regardless.

### 2. Whether Appellant invoked his right to counsel

We next address whether Appellant invoked his right to counsel. Although there may be differences between the protections provided by the United States and Tennessee constitutions with respect to the right to counsel, the standard used to determine whether one

has validly invoked his right to counsel is the same under both.  See Turner, 305 S.W.3d at 517; see also State v. Downey, 259 S.W.3d 723, 731 (Tenn. 2008).  As Downey explained:

> The accused must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer would understand the statement to be a request for an attorney. *If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel.*

Id. (quotation marks, brackets, and ellipses omitted) (quoting State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003)).  "If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal . . . the police are not required to end the interrogation . . . or . . . clarify whether the accused wants to invoke his or her Miranda rights."  Berghuis v. Thompkins, 130 S. Ct. 2250, 2259-60 (2010) (quotation marks omitted); see also  Davis v. United States, 512 U.S. 452, 459 (1994) ("If the statement fails to meet the requisite level of clarity, [United States Supreme Court case law] does not require that the officers stop questioning the suspect.").  "[G]eneric and equivocal statements made by a person who is still in the decision making process" do not invoke the right to counsel.  Saylor, 117 S.W.3d at 246.  However, this bright-line rule "applies only to post-waiver requests for counsel."  Turner, 305 S.W.3d at 519.  "Where . . . a suspect makes an equivocal request for counsel *prior to waiving Miranda rights*, the police are limited to questions intended to clarify the request until the suspect either clearly invokes his right to counsel or waives it."  Id.

Here, all of the statements to which Appellant points as requests for counsel were made *after* Appellant had already signed the November 22 Miranda waiver.  Because the police already had a valid waiver prior to Appellant's purported invocations of his right to counsel, this case falls under the bright-line rule described in Davis and Saylor.  Consequently, Appellant "bears the burden of showing he . . . revok[ed] the waiver and clearly insist[ed] upon his right to counsel prior to further interrogation."  Turner, 305 S.W.3d at 519.

While the trial court in this case held that Appellant did not request counsel at the December 2 meeting, it made no finding regarding whether Appellant made an unequivocal request for counsel prior to that time.  However, at the November 21, 2006 hearing, the trial court specifically discounted Mr. Foster's testimony that Chief Ridenour told him Appellant invoked his right to counsel.  The record before us does not preponderate against that finding.  Therefore, we review the record for other evidence that Appellant unequivocally invoked his right to counsel.

The record supports, at best, two instances of Appellant invoking his right to counsel. First, Appellant "mentioned a lawyer" during the November 26 interview at Detective Breeding's office. Appellant said the following during his direct examination:

Q. And what did you—did the subject of a lawyer come up?
A. Well, that was the—it was either two or three times actually that I talked to them. And that was the third time that I had said that. Officer Baker and Sargent Breeding was in the office at that time.
Q. This was on that Friday you think?
A. Yes, sir.
Q. And you told them—do you remember exactly what you said?
A. That I think I need to talk to a lawyer.
Q. And what did they say?
A. Well, that's when the same time when the lie detectors test came up. We didn't really talk too much after that is when he made the schedule for me to take the lie detectors test.

Appellant later changed his testimony and said that he was not certain what his exact words were:

Q. [D]o you remember as best you can your exact words? Did you say "I think I need a lawyer" or did you say "I might need a lawyer"?
A. I'm not sure. The second time in the office I mentioned a lawyer. And then over the phone I mentioned a lawyer.
Q. That you wanted one, to talk to one?
A. Yes, sir.
Q. Now, did you—were you still wondering about it or did you, had you decided you needed one?
A. Well, I felt I needed one.
Q. Okay. And that's what you told Mr. Breeding?
A. Yes, sir.

Second, Appellant mentioned a lawyer during the December 1 telephone conversation with Detective Breeding regarding the missed polygraph appointment. According to Detective Breeding, Appellant told the detective that he thought he would let the police arrest him so he could have an attorney because he could not otherwise afford one.

Neither statement is an unequivocal invocation of Appellant's right to counsel. None of the three iterations of Appellant's November 26 statement are unequivocal. Although Appellant was not certain what he said, the three versions he provides are: (1) "I think I need

to talk to a lawyer"; (2) "I think I need a lawyer"; and (3) "I might need a lawyer." Despite his testimony to the contrary, all three indicate Appellant was still in the decision making process; they do not clearly request counsel. See Saylor, 117 S.W.3d at 246. Indeed, they are similar to the statement in Davis, where the Supreme Court held that the statement, "Maybe I should talk to a lawyer," was insufficient to invoke Miranda. 512 U.S. at 462. Moreover, Appellant did not invoke his right to counsel after being read his Miranda rights prior to the polygraph on December 2. This further suggests that Appellant was equivocating. Thus, this situation is similar to others in which our courts have found the accused did not unequivocally and unambiguously invoke his right to counsel. See, e.g., Turner, 305 S.W.3d at 520-21 (holding that, in context, Turner's request "to retrieve his cell phone, which apparently contained the cell phone number of a pre-paid legal services provider" and his statement, "if I could afford one," in response to the question of whether he wanted an attorney present were not sufficiently clear invocations); Saylor, 117 S.W.3d at 243 & 246 (defendant's statements such as "I'm supposed to have a lawyer though, don't I?" and "You have to have a lawyer present before questioning" were "generic and equivocal statements made by a person who is still in the decision making process" where, after initially refusing, defendant signed a waiver form); State v. Mitchell, 137 S.W.3d 630, 632-33 & 637-38 (Tenn. Crim. App. 2003) (affirming trial court's judgment that the statements, "I think I may need an attorney," "I think I need an attorney," and "Do you think I need a lawyer?" combined with defendant's refusal to sign a waiver did not satisfy defendant's duty to present his request for counsel sufficiently clearly); State v. Adam Sanders, No. M2005-02185-CCA-R3-CD, 2006 WL 3516210, at *7-8 (Tenn. Crim. App. at Nashville, Dec. 6, 2006) (defendant's statement "I guess I need a lawyer, don't I?" after reading Miranda waiver form was not unambiguous when defendant later signed the waiver); Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *9 ("'Don't I need to talk to a lawyer?' does not suffice to invoke [the] right to counsel under Miranda."); State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *12-16 (Tenn. Crim. App. at Nashville, May 22, 1998) (holding that the statement, "I'm sorry, I'm just wondering if I should have a lawyer," was not an unequivocal request for counsel in light of subsequent agreement to make a statement).

Furthermore, these statements contrast with those previously deemed sufficiently clear to invoke the right to counsel. See, e.g., Turner, 305 S.W.3d at 522 (holding that the defendant's later statement, "Get me a lawyer," was an unequivocal invocation of his right to counsel); State v. Koffman, 207 S.W.3d 309, 319 (Tenn. Crim. App. 2006) ("Defendant's request to call [a judge and a federal defender who previously represented Defendant] prior to the initiation of questioning was an unequivocal request for the assistance of counsel."); State v. Michael Lee McCormick, No. E2003-02689-CCA-R9-DD, 2004 WL 2583903, at *11 (Tenn. Crim. App. at Knoxville, Nov. 15, 2004) (finding the statements, "I'd be willing to [cooperate], I'd like to have a lawyer at this point," and, "I'll do anything, but I still think

I, you know, like to have a lawyer with me, and I'll be glad to [cooperate]," to be clearly and unambiguously requesting counsel); State v. Tidwell, 775 S.W.2d 379, 387 (Tenn. Crim. App. 1989) (finding the statement, "I'd like to call a lawyer before I discuss that," to be an unequivocal invocation).

Given Appellant's prior Miranda waiver and the ambiguity of his statement, we conclude that the November 26 statement was not so unambiguous or unequivocal that reasonable officers would understand that Appellant was requesting an attorney.

Appellant's December 1 statement is a closer call. Both Appellant and Detective Breeding acknowledge that Appellant made some comment indicating that he wanted an attorney. In particular, Detective Breeding testified about the conversation as follows:

Q.   So you call [Appellant] and tell him "December, the 1st?"
A.   Yes. And he said he could get a way over there. I did not go and was not going to go. It was under his own will that he wanted to do that.
Q.   So you didn't go to Knoxville?
A.   No. I was called and notified that he did not make it to that polygraph.
Q.   All right. And then you called [Appellant] on the phone?
A.   I did.
Q.   And you tell him about another polygraph set up?
A.   No. I asked him why he had not made it, and he said he didn't have any transportation.
Q.   Is that when he tells you he thinks he might ought to talk to a lawyer?
A.   He also states during that time that he thought he would let me arrest him, because he couldn't afford an attorney.
Q.   Now verbatim he said what to you?
A.   He thought he would let me arrest him, because he could not afford an attorney. That he could get an attorney.
Q.   So that he could get an attorney. And this is between December 1st and December 2nd?
A.   Yes. It was on December 1st, and then my reply to that was: You're the one that wanted the polygraph.
Q.   And so you told him about one set up for the 2nd?
A.   Yes.
Q.   And you told him the best verbatim as: You're the one that wanted the polygraph?
A.   Yes.
Q.   And what did he say?
A.   Well, he said: I'll take it.

Q.    All right.  That's when you set it up again?
A.    Yes.

In isolation, Appellant's comment about being arrested so that he could obtain counsel appears to be sufficient to cause a reasonable law enforcement officer to understand that he was invoking his right to counsel.  However, the statement was not made in isolation but rather as part of the conversation between Appellant and Detective Breeding about rescheduling the polygraph.  As the United States Supreme Court has previously noted, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." Davis, 512 U.S. at 461.[6]  Here, Appellant made his statement to Detective Breeding during a conversation about why Appellant missed the polygraph appointment that Appellant had requested and whether they should reschedule that appointment.  It is reasonable and legitimate to infer from this evidence that Detective Breeding's response to Appellant's statement that the police should arrest him so he could obtain an attorney was to clarify whether Appellant was invoking his right to counsel and therefore no longer wanted to take the polygraph.  Appellant's reply that he still wanted to take the polygraph indicates that his prior statement was made in the decision making process.  It is therefore not an unequivocal invocation of the right to counsel.  We conclude that Detective Breeding attempted to clarify Appellant's statement and, in so doing, revealed that Appellant was not invoking his right to counsel.

On the record before us, we conclude that Appellant did not invoked his right to counsel prior to giving his December 2 statement.

### 3.  Whether Appellant waived his right to counsel

We next turn to whether Appellant waived his right to counsel.  We conclude that, regardless of whether Appellant invoked his right to counsel at some point prior to December 2, he voluntarily waived that right when he gave his inculpatory statement.

As noted above, an accused may waive his Miranda rights so long as the waiver is voluntarily, knowingly, and intelligently made.  See Callahan, 979 S.W.2d at 581; see also Berghuis, 130 S. Ct. at 2260 ("The waiver inquiry has two distinct dimensions: [1] waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and [2] made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

---

[6]  Again, Turner held that clarification is mandatory in the pre-waiver context.  See 305 S.W.3d at 516-17.

(quotation marks omitted)). Even if the accused unequivocally invokes his right to counsel, he can later waive those rights. But, there must be "additional safeguards" to ensure that the later statements are accompanied by "a valid waiver of that right." Koffman, 207 S.W.3d at 319 (quotation marks omitted); see also Shatzer, 130 S. Ct. at 1219 (citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)). In such cases, the State must show that the accused both "made an intelligent and knowing waiver" and that he "initiated a subsequent conversation which ultimately led to his confession." Koffman, 207 S.W.3d at 319; see also Turner, 305 S.W.3d at 515-16. The State must meet this "heavy burden," but it need not show an express waiver, and its burden "is not more than the burden to establish waiver by a preponderance of the evidence." Berghuis, 130 S. Ct. at 2261. To meet that burden, the State must show that Appellant was informed of his Miranda rights, made an uncoerced statement, and that he understood his rights. Id. at 2262. Assuming *arguendo* that Appellant invoked his right to counsel, we find that the "additional safeguards" are present here.

The trial court concluded that Appellant waived his Miranda rights and voluntarily gave his December 2 statement. It found that Appellant requested the polygraph; freely drove himself to the appointment; was advised of his rights; signed a form waiving those rights; participated in the examination, during which he never requested counsel, asked to delay the questioning, or otherwise indicated he was unwilling to continue; then agreed to the subsequent interview; freely gave a statement, which references his Miranda rights; and reviewed, edited, and signed his statement. The record does not preponderate against these findings.

These facts demonstrate that the additional safeguards required by Koffman are present. With respect to whether Appellant initiated the subsequent discussion, the trial court found, and the record demonstrates, that Appellant requested the polygraph during either the November 22 or the November 26 interview. When Appellant mentioned an attorney during the November 26 interview, the substantive portion of the interview then stopped, and the discussion turned to scheduling the polygraph exam. It was set for nearly a week later. In the interim, Appellant left the detectives' office and was free to do whatever he wanted. He was also free to seek legal advice, but he apparently declined to do so. After Appellant missed the first appointment, Detective Breeding contacted him to find out why he failed to attend.[7] Appellant did not say he missed the appointment because he no longer wanted to take the exam or he wanted to first consult counsel. Instead, he said he had transportation

_____

[7] Mr. Foster testified that Detective Breeding called him and that he—Mr. Foster—then called Appellant to tell him that Detective Breeding wanted to speak with Appellant. This conflicts with Detective Breeding's version. It is not clear that the trial court discounted this portion of Mr. Foster's testimony. If Mr. Foster is correct, and Appellant chose to call Detective Breeding, that provides additional support for the conclusion that Appellant initiated the contact and reached out to law enforcement to make his statement.

problems. During that conversation, however, Appellant made comments about being arrested so he could have an attorney. Yet after making that statement, he still said he wanted to take the polygraph exam the next day. He arrived of his own volition and was again advised of his rights. He never requested counsel or tried to delay either the polygraph or the subsequent interview. Based upon those facts, we conclude that Appellant "initiated" the conversations that took place subsequent to his statements about counsel.

Appellant contends he was coerced into agreeing to the interview, citing evidence that Chief Ridenour told Mr. Foster that he would arrest Appellant if Appellant refused to take the polygraph. The trial court specifically sought testimony from Chief Ridenour to determine if he coerced Appellant into testifying. Chief Ridenour testified that he did not recall saying Appellant would be arrested and that he had no intention of arresting Appellant if he did not show up for the polygraph. The trial court discounted Mr. Foster's testimony about Chief Ridenour's comments to him and concluded there was no coercion. The record supports the trial court's decision.

Having determined that Appellant initiated the subsequent conversation, the next question is whether Appellant knowingly and voluntarily waived his right to counsel. See Koffman, 207 S.W.3d at 319. Our courts look to the totality of the circumstances surrounding the interrogation to determine if the criteria for a proper waiver are met. See State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn. 1993). In doing so, we consider the following factors regarding the voluntariness of a confession: (1) the appellant's age, education or intelligence level, and previous experience with the police; (2) the repeated and prolonged nature of the interrogation; (3) the length of detention prior to the confession; (4) the lack of any advice as to constitutional rights; (5) the unnecessary delay in bringing the appellant before the magistrate prior to the confession; (6) the appellant's intoxication or ill health at the time the confession was given; (7) deprivation of food, sleep, or medical attention; (8) any physical abuse; and (9) threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Furthermore, this court has stated:

> [c]oercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was such as to overbear [Appellant's] will to resist and bring about confessions not freely self-determined. The question must be answered with complete disregard of whether or not the accused was truthful in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (quotation marks and citations omitted).

In this case, those factors strongly indicate that Appellant's waiver was knowing, voluntary, and "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Berghuis, 130 S. Ct. at 2261 (quotation marks omitted). Appellant was in his mid-forties when he made the statement, possessed a G.E.D., and was an honorably discharged Navy veteran. Appellant appears to have had little prior interaction with the police, but his experiences in the prelude to the December 2 polygraph do not appear particularly intimidating. He often dealt with law enforcement through Chief Ridenour, his acquaintance, if not friend. He drove to and from the November 26 interview on his own. He was not detained for long periods, nor was he exposed to prolonged periods of interrogation. He was repeatedly read his constitutional rights, and he repeatedly signed forms waiving those rights. Appellant never appeared intoxicated or in ill health; he was never deprived of sleep, food, or medical attention; and he was not physically or mentally abused. In short, none of the Huddleston factors suggest Appellant's statement was not given knowingly or voluntarily, and there is no evidence of coercive law enforcement activity, see Phillips, 30 S.W.3d at 377.

Moreover, the circumstances surrounding his statement indicate that Appellant made it freely and voluntarily. When he arrived for the December 2 appointment, he was again read his Miranda rights and was specifically told that he was not under arrest. He was asked if he understood his rights and if he nevertheless wanted to continue. He responded affirmatively. He again signed a Miranda waiver. He then took the polygraph examination and over the course of the meeting was free to take breaks, which he did. At the conclusion of the examination, Appellant was offered the opportunity to discuss some of his answers. He accepted the invitation and, during that discussion, admitted to shooting the victim. When Detective Breeding returned to the room, Appellant repeated his admission. Agent Slagle summarized Appellant's statement in writing. That written statement began with another express waiver of Appellant's Miranda rights. Appellant had an opportunity to review and correct or change the statement. Ultimately, Appellant signed two copies of the statement, and he was later arrested. From the time Appellant said he would take the rescheduled polygraph until he was arrested, there is no evidence that he asked for an attorney or sought to delay the polygraph or the subsequent interview. We thus conclude that Appellant's December 2 waiver of his constitutional rights was knowing and voluntary. As a result, both additional safeguards mentioned in Koffman are met here, and the trial court did not error in denying Appellant's motion to suppress.

In sum, Appellant was repeatedly informed of his Miranda rights, and he repeatedly waived those rights. In our view, he never unequivocally invoked his right to counsel. Instead, he knowingly and voluntarily waived that right. Nevertheless, even if Appellant invoked his right to counsel, both Koffman safeguards are present because, in addition to knowingly and voluntarily waiving his right to counsel, Appellant initiated the subsequent

interrogations that lead to his inculpatory statement. The trial court did not err in denying Appellant's motion to suppress.

## B. Sufficiency Of The Evidence

We now turn to Appellant's contention that the State produced insufficient evidence to sustain his conviction for premeditated murder. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Id. at (d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to: declarations of the intent to kill; evidence of the procurement of a weapon; the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; preparations before the killing for the purpose of concealing the crime; and calmness immediately after the killing. Id.

Giving the State the strongest legitimate view of the evidence, we conclude that there was a sufficient basis to convict Appellant of first degree premeditated murder. Appellant admitted in his December 2 statement, which we have already concluded was properly admitted, that he killed the victim. The question then becomes whether the killing was premeditated. The evidence at trial supported several of the Bland factors, which allowed

-36-

the jury to conclude that Appellant's actions were premeditated. There is evidence that Appellant made ominous statements to Latasha Cooper that suggested he intended to kill the victim. Appellant procured a gun and ammunition shortly before the killing. Although Appellant claims the victim charged at him with a lug wrench, the physical evidence showed that the victim was found more than forty feet from where Appellant claimed to have been when he fired the weapon. In addition, the lug wrench was lying on the ground near the victim, covered by a jacket. Consequently, the strongest legitimate view of the evidence is that the victim was unarmed. Additionally, Appellant fired at least eight shots, seven of which hit the victim. Moreover, while Appellant claims he was distressed after the shooting, the witnesses who spoke to or saw Appellant immediately after the crime described him as acting normally. Furthermore, Appellant took the time to dispose of the murder weapon, which could be interpreted as demonstrating calmness after the shooting. Thus, although Appellant claimed that he did not go to the victim's house intending to shoot him, the jury appears to have discredited that testimony. Regardless, although premeditation requires that the intent to kill be formed in advance of the act, see Tenn. Code Ann. § 39-13-202(d), it does not need to be formed for a particular amount of time. In other words, the necessary *mens rea* could have been formed in the moments just before the shooting.

In short, the jury appears to have simply rejected Appellant's self-defense version of the events. Our reading of the record supports its decision. Appellant's sufficiency argument therefore fails.

### C. Autopsy Report

Appellant next contends the trial court erred in admitting Dr. Blake's autopsy report into evidence. Appellant claims that the report contains a hearsay statement and the State failed to establish that the statement is admissible under the hearsay exceptions in Tennessee Rules of Evidence 803(6) or 803(8). Here, the only possible hearsay statement contained in the report is: "Proffered police history of multiple small caliber gunshot wounds to the decedent who was in the process of repairing or adjusting his automobile."[8] Appellant also contends that the admission of the report improperly bolstered Dr. Blake's testimony and "allowed the jury to conveniently forget that the in-court testimony was that the findings were consistent with [Appellant's] recitation of how the shooting came about."

At the outset, it is important to specify how Appellant has framed this issue—or, more importantly, how he has not. While Tennessee Code Annotated section 38-7-110(a) provides for admission of autopsy reports, the section also limits their content, see id. at (b). Among the items statutorily excluded from autopsy reports are "statements made by witnesses or

---

[8] Underlining in original.

other persons." Id. Appellant has never argued—at trial, in his motion for new hearing, or on appeal—that the statement in Dr. Blake's report concerning the "proffered police history" should be excluded under 110(b). Instead, as discussed below, Appellant's entire section 110 argument concerns whether the autopsy report is a public document under subsections (a), (c), and (d). That argument is part of his larger point that the contents of the autopsy report should have been excluded as hearsay under the Rules of Evidence. His argument is not that any statement is excluded by statute under 110(b).[9] The statutory argument under subsection (b) is thus waived. Regardless, even if the "proffered police history" statement should have been excluded on statutory grounds, we believe such an error was harmless. The report does not purport to confirm or deny that history. In fact, Dr. Blake testified that the report's conclusions were consistent with Appellant's contention that the victim was approaching Appellant when he was shot. Moreover, we do not believe any reasonable jury would have interpreted the autopsy report's preliminary statement as proof-positive of what transpired; neither Dr. Blake nor the "police" who apparently apprised Dr. Blake of the situation were present at the scene during the shooting. Furthermore, this statement was minuscule in the context of the entire record presented to the jury. We are convinced that the jury was swayed by the overwhelming evidence of Appellant's guilt, not this stray comment in the autopsy report.

With that said, we turn to Appellant's contention that the report contains a hearsay statement that is inadmissible under the Tennessee Rules of Evidence. Rules 401 and 402 provide that all evidence that tends to make the existence of a consequential fact more or less likely is generally admissible. See State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Yet even relevant, probative evidence may be excluded if it is hearsay. See Tenn. R. Evid. 802. Hearsay evidence must fall within one of the delineated exceptions in order to be admissible. See id.

The trial court has discretion to determine whether the proffered evidence is relevant; thus, we will not overturn that decision absent an abuse of discretion. See State v. Carruthers, 35 S.W.3d 516, 574 (Tenn. 2000). However, as this court held in State v. Gilley, our review of a trial court's admission or exclusion of hearsay is de novo. 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008).

---

[9] We acknowledge that section 110(b) may exclude statements such as the "proffered police history" statement if they contain details or conclusions regarding a police department's investigation. See Tenn. Code Ann. § 38-7-110(b); accord State v. Randall Gibbs, No. 01C01-9409-CC-003300, 1995 Tenn. Crim. App. LEXIS 586, at *16 (Tenn. Crim. App. at Nashville, July 14, 1995) (Summers, J., concurring) (citing 2 John William Strong, McCormick on Evidence § 249, p. 104 (4th ed. 1992)).

The statement at issue here does not preclude the admission of the autopsy report. We read the statement as explaining why Dr. Blake performed the autopsy—he was told by police that the victim was shot to death while repairing his car. That proffered history triggered a statutory duty to inform the county medical examiner, see Tenn. Code Ann. § 38-7-108(a)(1), who, in turn, was obliged to conduct the autopsy, see id. at -109. In short, it was not offered to prove that the victim was killed by "multiple small caliber gunshot wounds" while he was "repairing or adjusting his automobile." Thus, we do not view it as having been offered to prove the truth of the matter asserted and is therefore not hearsay. See Tenn. R. Evid. 801(c). We recognize that our conclusion that the statement was not offered for the truth of the matter asserted may create questions concerning whether the statement is even relevant. But that issue was not raised by Appellant, and we decline to hold that it warrants relief under our plain error standard. See Tenn. R. App. P. 13(e); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); see also State v. Curtis Lee Majors, __ S.W.3d __, No. M2007-01911-SC-R11-CD, 2010 WL 3463199, at *10 (Tenn. Sept. 3, 2010); State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error).

Even if the autopsy report contains hearsay, the report is admissible as a public record under Rule 803(8). Appellant claims that the record lacks a sufficient evidentiary basis to meet the Rule 803(8) exception and points to Tennessee Code Annotated section 38-7-110(a), (c), and (d) to argue that the report is not a public document under those subsections as much as it is a police report.

We are not persuaded. Appellant is correct that Dr. Blake's testimony provides little foundation to meet the requirements for admitting the autopsy report. However, as the report makes clear, Dr. Blake is an Assistant Chief Medical Examiner for the State of Tennessee. That is a position created within the post-mortem examination division in the department of health, see Tenn. Code Ann. § 38-7-102, and is appointed by the chief medical examiner, see id. at -103(b). Even if he were not, he was engaged by the county medical examiner to conduct the autopsy, cloaking him with such powers and obligations. See Tenn. Code Ann. § 38-7-109(b); see also id. at -106(a). Dr. Blake's report thus falls into the parameters of admissible records under section 110(a). The fact that the examination was conducted upon notice from the Anderson County Sheriff's Department does not make the document a police report because all law enforcement officers are under an obligation to notify the appropriate medical examiners in the case of suspicious deaths. See id. at -108(a). Moreover, this particular report specifically notes that Dr. Blake was engaged to perform the autopsy at the request of the Anderson County Medical Examiner, not the sheriff. It therefore satisfied section 110(a). That means the report is one from a "public[] office[] . . . setting forth . . . matters observed pursuant to a duty imposed by law as to which matters there was a duty to report." Tenn. R. Evid. 803(8). It thus falls within an exception to the general rule excluding

hearsay evidence. This conclusion is in line with several Tennessee cases holding that an autopsy report is admissible under Rule 803(8). See, e.g., State v. Davis, 141 S.W.3d 600, 622 & 630 (Tenn. 2004) (adopting the Court of Criminal Appeals' analysis and conclusions upholding the admission of autopsy reports as public documents under Rule 803(6) and 803(8)); State v. Christopher Shane Harrell, E2005-01531-CCA-R3-CD, 2007 WL 595885, at *12-13 (Tenn. Crim. App. at Knoxville, Feb. 26, 2007) (holding that a statement regarding the alleged cause of the injuries being examined that was contained in an autopsy report was not hearsay because it was not offered to establish the truth of the matter asserted, and even if it was the autopsy report satisfied Rule 803(8)).

We are likewise unpersuaded by Appellant's contention that admission of the autopsy report unfairly "bolstered" Dr. Blake's testimony. Appellant cites no authority to exclude the report on such grounds. Regardless, the report falls into the statutory scheme for admitting autopsy reports. See Tenn. Code Ann. § 38-7-110(a). The jury could thus give the report, along with Dr. Blake's testimony that its conclusions are not inconsistent with Appellant's theory, whatever value it deemed appropriate.

We therefore conclude that the trial court did not err in admitting the autopsy report.

### D. Jury Instructions And Verdict Form

We next address Appellant's arguments regarding the instructions given to the jury. A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247 (Tenn. 2002). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. See State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Appellant raises essentially three arguments regarding the jury instructions. First, Appellant claims that it was error to instruct the jury that it could not consider the lesser-included offenses until it had determined that Appellant was not guilty of all greater charges. Second, and relatedly, Appellant argues it was error to reiterate the sequential instruction on the jury verdict forms. Repeating it, Appellant says, placed an undue weight on that

instruction because the trial court did not repeat any others. Finally, Appellant claims that certain other instructions were either given or omitted in error.

### 1. Sequential determination charge in the jury instructions and verdict forms

We start with the sequential determination jury instruction. Appellant complains that instructing the jury to not consider the lesser charges until it had agreed to acquit him of all greater offenses violated his right to trial by jury. He correctly notes, however, that our supreme court has recently addressed this issue and ruled to the contrary. See State v. Davis, 266 S.W.3d 896, 901-05 (Tenn. 2008). Not only did Davis determine the sequential instruction to be constitutional, it also endorsed the practice as a matter of policy. See id. at 905-08. Appellant contends that the court's decision creates a separation of powers issue because the legislature has not "confer[red] authority to judges to structure jury deliberations." Whatever the merits of this position, we are bound to follow the dictates of our supreme court, which has determined that sequential jury instructions are appropriate and constitutional. We will not second-guess that decision here.

Appellant next asserts that reiterating the sequential determination instruction on the jury verdict forms was error. According to Appellant, including the instruction on the verdict forms improperly highlighted that particular instruction and thus gave it greater weight than the others. Our supreme court noted in Davis that the sequential determination instruction helps the trial court structure jury deliberations to promote orderly fact-finding. See 266 S.W.3d at 907. Thus, the trial court did not err here in giving the sequential determination jury instruction or in reiterating that instruction on the verdict form.

### 2. Other jury instructions

Appellant's last argument is that certain instructions were either given or omitted in error. As noted above, the record in this case contains two sets of instructions, one included in the transcript and one in the exhibits. Appellant's arguments regarding the instructions all concern the instructions included in the transcript version. That version, he contends, contains an inappropriate instruction regarding "confessions" and omits a necessary "self-defense" instruction. He argues that these mistakes, if made, constitute plain error.[10] However, he acknowledges that there is a question regarding which instructions were actually given.

There is one terminal problem with Appellant's plain error argument. Our plain error analysis requires, among other things, that "the record clearly establish what occurred in the

---

[10] Appellant did not raise these issues in his motion for a new trial.

trial court." <u>Adkisson</u>, 899 S.W.2d at 641-42; <u>see also</u> <u>Majors</u>, __ S.W.3d __, No. M2007-01911-SC-R11-CD, 2010 WL 3463199, at *10; <u>Smith</u>, 24 S.W.3d at 283. Because it is not clear from the record that the transcription version of the instructions were given to the jury, there would be no way for Appellant to satisfy this requirement of the plain error analysis.

We note that Appellant had a means of remedying the problem. Tennessee Rule of Appellate Procedure 24(e) provides a mechanism for correcting or modifying misstatements in the record. Appellant declined to pursue that option, and therefore the trial court has not had an opportunity to clarify which instructions were given. As explained above, that ambiguity precludes us from finding plain error with respect to the jury instruction issues Appellant now raises.

In sum, we are not persuaded by any of Appellant's arguments regarding the jury instructions in this case.

### III.  Conclusion

Upon review of the record and the parties' briefs, for the reasons articulated above we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE